# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JPMORGAN CHASE BANK, N.A., individually, and on behalf of itself and other creditors similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2018-0274-AGB |
| CLAUDIO BALLARD, KEITH DELUCIA, GARY KNUTSEN, SHEPHARD LANE, PETER LUPOLI, IRA LEEMON, JOHN KIDD, CELESTIAL PARTNERS, LLC, ZAAH TECHNOLOGIES, INC., VEEDIMS, LLC, POTENS PARTNERS LLC, AND DATATREASURY CORPORATION | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## OPINION

Date Submitted: April 11, 2019
Date Decided: July 11, 2019

Gregory P. Williams and John D. Hendershot, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Zachary G. Newman, Annie P. Kubic, and Steven R. Aquino, HAHN & HESSEN LLP, New York, New York; *Attorneys for Plaintiff JPMorgan Chase Bank, N.A.*

Michael A. Weidinger and Elizabeth Wilburn Joyce, PINCKNEY, WEIDINGER, URBAN & JOYCE LLC, Greenville, Delaware; *Attorneys for Defendants Claudio Ballard, Keith DeLucia, Shephard Lane, Peter Lupoli, Ira Leemon, John Kidd, Celestial Partners, LLC, and VEEDIMS, LLC.*

Andrew D. Cordo, ASHBY & GEDDES, PA, Wilmington, Delaware; Rachel A. Kerlek, WOODS, WEIDENMILLER, MICHETTI & RUDNICK, LLP, Naples, Florida; *Attorneys for Defendant Gary Knutsen*.

**BOUCHARD, C.**

In June 2005, JPMorgan Chase Bank, N.A., ("J.P. Morgan") and Data Treasury Corporation ("DTC") entered into a licensing agreement to settle a patent infringement lawsuit. In exchange for a license on DTC's check imaging patents, J.P. Morgan paid $70 million to DTC, subject to J.P. Morgan's right to receive a refund if DTC licensed the same patents to someone else on more favorable terms.

Beginning in January 2006, DTC licensed its patents to many other companies for a small fraction of what J.P. Morgan had paid for its license without telling J.P. Morgan, in violation of DTC's obligation to do so. After catching wind of this, J.P. Morgan sued DTC and obtained a final judgment against DTC for $69 million in June 2015. The judgment was affirmed on appeal in 2016 but remains unpaid.

J.P. Morgan brings this action in aid of its efforts to collect on its judgment. J.P. Morgan asserts claims against DTC, its directors at relevant times, and certain affiliates to recover two categories of distributions that DTC allegedly made unlawfully to evade its liability for the refund it owed to J.P. Morgan: (i) dividends DTC paid its stockholders from 2006 to 2010, and (ii) other payments DTC made to certain insiders from 2011 to 2013. J.P. Morgan's two main claims are that DTC's directors should be personally liable for the dividends DTC paid from 2006 to 2010 under 8 *Del. C.* § 174, and that J.P. Morgan is entitled to recover all of the distributions at issue (both the dividends and other payments) because they were fraudulent transfers under the Delaware Uniform Fraudulent Transfer Act.

1

DTC moved to dismiss all of J.P. Morgan's claims on a variety of grounds. The motion implicates two questions of first impression concerning Section 174 of the Delaware General Corporation Law, and a third question of first impression concerning a limitations period in the Delaware Uniform Fraudulent Transfer Act.

The first question is whether one must be a *judgment creditor* at the time of an allegedly unlawful dividend to have standing to maintain a claim under Section 174 to recover the dividend for the benefit of the corporation's "creditors" in the event of the corporation's insolvency. As explained below, the court concludes that the answer to this question is no because the term "creditors" as used in Section 174 only requires that a person *have a claim* at the time of the allegedly unlawful dividend. The court thus finds that J.P. Morgan has standing as a creditor of DTC to assert a claim under Section 174 to recover for itself and other creditors of DTC the dividends DTC paid from 2006 to 2010 even though J.P. Morgan did not obtain its judgment against DTC until 2015.

The second question is whether the six-year limitations period in Section 174 is a statute of limitations to which tolling principles may be applied, or a statute of repose to which tolling principles do not apply. Based on the plain language of the statute, as confirmed by the legal history of Section 174 dating back to the late 1800's, the court concludes that the six-year limitations period in Section 174 is a statute of repose. The court thus finds that J.P. Morgan's Section 174 claim must be

2

dismissed as untimely because it did not file this action until 2018, more than six years after any of the challenged dividends were paid.

The third question is whether the one-year discovery period in Section 1309(1) of the Delaware Uniform Fraudulent Transfer Act starts when the mere existence of an allegedly fraudulent transfer is or could reasonably have been discovered, or whether it starts when the fraudulent nature of the transfer was or could reasonably have been discovered. Based on the reasoning and substantial weight of authority in other jurisdictions that have considered the issue, the court adopts the latter approach and finds that all of J.P. Morgan's fraudulent transfer claims (challenging both the dividends and other payments) were timely filed.

For the reasons just summarized, and others explained below, defendants' motion to dismiss the complaint is granted in part and denied in part.

## I. BACKGROUND

The facts recited herein are based on the allegations of the Verified Complaint (the "Complaint") and documents incorporated therein.[1] Any additional facts are either not subject to reasonable dispute or are subject to judicial notice, including

---

[1] *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) (stating that "plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms" in connection with a motion to dismiss) (internal quotation marks omitted).

opinions in the action J.P. Morgan brought against DTC in the United States District Court for the Eastern District of Texas (the "Texas Action").

## A. The Parties

J.P. Morgan is a National Association organized under the laws of the United States, with its principal place of business in Columbus, Ohio. It is a successor in interest to Bank One Corporation.

DTC is a Delaware corporation. Since 2005, DTC's primary business was suing financial institutions for infringement of two patents for check-imaging technology, often settling such lawsuits by entering into licensing agreements. DTC is a non-public company that allegedly maintained assets below $10 million so it would not be subject to any reporting requirements of the Securities and Exchange Commission.[2]

The Complaint names seven individuals as defendants who served as directors of DTC when the transactions at issue in this case occurred: Claudio Ballard, Keith DeLucia, Gary Knutsen, Shephard Lane, Peter Lupoli, Ira Leemon, and John Kidd (collectively, the "DTC Directors"). Ballard was the founder of DTC and its Chairman at all relevant times. He died after this action was filed. Knutsen was DTC's Vice Chairman and a Finance Committee member before he resigned from all of his positions at DTC on or about December 29, 2012.

---

[2] Compl. ¶ 61 n.4.

Defendant Celestial Partners, LLC was a Delaware limited liability company "owned, operated, controlled, and dominated by Ballard" and is alleged to be the alter ego of Ballard.[3] Defendants Potens Partners LLC and VEEDIMS, LLC are both Delaware limited liability companies that were owned and controlled by Ballard. Defendant Zaah Technologies, Inc. is a Delaware corporation and an affiliate of DTC.

## B. The 2005 License Agreement Between DTC and J.P. Morgan and Subsequent Licensing Agreements

On June 28, 2005, J.P. Morgan and Bank One each entered into a licensing agreement with DTC in connection with settling a lawsuit DTC had brought against them for allegedly infringing its patents. Before the agreements were executed, Bank One merged into JPMorgan Chase & Co., J.P. Morgan's parent company. These two licensing agreements are referred to together as the "JPM License Agreement." DTC received a total of $70 million under the JPM License Agreement, $30 million up front and the remaining $40 million in annual installments through May 31, 2012.[4]

Section 9 of the JPM License Agreement contains a most-favored license provision (the "MFL Provision"). It states, in relevant part, that:

> If DTC grants to any other Person a license to any of the Licensed Patents, it will so notify [J.P. Morgan], and [J.P. Morgan] will be

---

[3] *Id.* ¶ 8.

[4] *Id.* ¶¶ 20, 23.

entitled to the benefit of any and all more favorable terms with respect to such Licensed Patents. . . . The notification required under this Section shall be provided by DTC to [J.P. Morgan] in writing within thirty (30) days of the execution of any such third party license and shall be accompanied by a copy of the third party license agreement, which may be redacted by DTC if necessary to comply with any judicial order or other confidentiality obligation.[5]

In a July 2005 press release, DTC stated that the JPM License Agreement included "'most favored licensee' protection for JPMorgan Chase, giving the bank a competitive edge in check-processing."[6] According to the Complaint, although J.P. Morgan was unaware of it at the time, DTC began violating the MFL Provision soon after entering into the JPM License Agreement by entering into licensing agreements for the same patents with other parties without informing J.P. Morgan.[7]

In January 2006, DTC granted NCR Corporation a lump-sum license for the same patents for $2.85 million.[8] A few months later, DTC granted another lump-sum license for only $575,000.[9] Between 2006 and 2013, DTC entered into dozens of other licensing agreements involving the same patents, many of which were for significantly less than the terms of the JPM License Agreement.[10] In one license

---

[5] *Id.* Ex. C at 2.

[6] *Id.* ¶ 19 (citing *id.* Ex. A).

[7] *Id.* ¶ 21.

[8] *Id.* ¶ 22.

[9] *Id.*

[10] *Id.* ¶ 24; *see also id.* Ex. B (containing J.P. Morgan's expert report in the Texas Action discussing and quantifying the difference between the price terms).

relevant to the outcome of the Texas Action, DTC licensed the same patents covered under the JPM License Agreement to Cathay General Bancorp on October 1, 2012 for a lump sum of $250,000 (the "Cathay license").[11]  DTC did not notify J.P. Morgan about the Cathay license and did not include the refund owed to J.P. Morgan on its financial statements, balance sheets, or list of liabilities.[12]

On or about June 9, 2011, J.P. Morgan sent a letter to DTC indicating that it learned that DTC had entered into other license agreements, requesting copies of such agreements, and reminding DTC that a refund was due if any of those agreements contained more favorable payment terms.[13]  On June 21, 2011, DTC responded, confirming it would give J.P. Morgan "access to all of its license agreements in accordance to the terms of the [JPM License] Agreement."[14]  Over the next few months, DTC sent letters to numerous subsequent licensees advising them that DTC would provide copies of their license agreements to J.P. Morgan for review.[15]

---

[11] *JP Morgan Chase Bank, N.A. v. DataTreasury Corp.*, 79 F. Supp. 3d 643, 647 (E.D. Tex. 2015).

[12] Compl. ¶¶ 25, 33.

[13] *Id.* ¶ 34; *id.* Ex. C.

[14] *Id.* ¶ 35; *id.* Ex. D.

[15] *Id.* ¶ 35; *see also id.* Ex. E (DTC letters to subsequent licensees).

## C. DTC Issues Dividends (2006-2010)

Between 2006 and 2010, while DTC continuously was entering into license agreements for the same patents with more favorable terms than the JPM License Agreement, it issued more than $117 million in dividends to its stockholders.[16] These dividends are referred to hereafter as the "Challenged Dividends."

J.P. Morgan alleges that during this time period, DTC and its directors knew or should have known that its business was in jeopardy. Not only should they have known that DTC owed J.P. Morgan a large refund under the JPM License Agreement,[17] but they also knew that the America Invents Act[18]—signed into law in 2011—could impede DTC's primary income source.[19] J.P. Morgan alleges that DTC's board of directors willfully, recklessly, or negligently approved the payments of these dividends at a time when DTC lacked sufficient surplus or net profits, that DTC was insolvent or rendered insolvent at the time of the dividends, and that the payments were made to avoid paying J.P. Morgan.[20]

---

[16] *Id.* ¶ 112.

[17] *Id.* ¶ 63.

[18] 35 U.S.C. §§ 1 et seq.

[19] Compl. ¶¶ 40-43.

[20] *Id.* ¶¶ 53-57.

8

### D. DTC Transfers Funds to Insiders (2011-2013)

Between 2011 and 2013, while DTC was on notice that it may owe J.P. Morgan a large refund and after J.P. Morgan commenced litigation against it, DTC transferred approximately $13.7 million to the following insiders and affiliates:[21]

| Recipient | 2011 | 2012 | 2013 | Total |
|---|---|---|---|---|
| Shephard Lane | $959,843 | $3,112,586 | $258,800 | $4,331,229 |
| Keith DeLucia | $2,725,000 | $925,000 | $186,757 | $3,836,757 |
| Celestial Partners (Ballard affiliate) | $863,009 | $3,098,807 | $0 | $3,961,816 |
| Gary Knutsen | $52,000 | $0 | $52,000 | $104,000 |
| Peter Lupoli | $52,000 | $52,000 | $52,000 | $156,000 |
| Ira Leemon | $52,000 | $52,000 | $52,000 | $156,000 |
| John Kidd | $52,000 | $52,000 | $52,000 | $156,000 |
| Potens (Ballard affiliate) | $0 | $110,208 | $0 | $110,208 |
| Zaah Technologies (DTC affiliate) | $0 | $0 | $915,811 | $915,811 |

The transfers listed above are referred to hereafter as the "Challenged Transfers."

DTC also made a $1.5 million loan to VEEDIMS in 2012.[22]

---

[21] *Id.* ¶¶ 125-33.

[22] *Id.* ¶ 84.

Several of these transfers were discussed during a board meeting on June 13, 2012. Knutsen asked about the payment to Potens, but Ballard could not recall why the payment was made and DTC's CEO DeLucia stated that he was not aware of any authorized payments to Potens.[23] Ballard promised to look into the reason for the payment.[24] At the same meeting, Knutsen questioned a $300,000 payment to Celestial, DeLucia indicated that he was not aware of the payment, and Ballard could not recall the exact reason for it but thought it may have been a loan to him.[25]

### E.    The Texas Action

On November 29, 2012, J.P. Morgan sued DTC in the Texas Action.[26] On February 5, 2015, the district court partially granted J.P. Morgan's motion for summary judgment.[27]

In its summary judgment motion, J.P. Morgan sought "the benefit of the more favorable price and other terms of the Cathay license."[28] The district court concluded that there was no material dispute that DTC was in breach of the JPM License Agreement.[29] It reasoned that the MFL Provision was self-executing because its

---

[23] *Id.* ¶ 86.

[24] *Id.* Ex. O.

[25] *Id.* ¶ 87; *see also id.* Ex. O.

[26] *Id.* ¶ 36.

[27] *JP Morgan Chase Bank*, 79 F. Supp. 3d at 646.

[28] *Id.* at 647-48 & n.4.

[29] *Id.* at 651.

plain language "makes its operation automatic" and that DTC violated the provision by failing to give J.P. Morgan timely notice of the Cathay license.[30]

Turning to damages, the district court held that the MFL Provision applied retroactively to lump-sum license agreements such as the Cathay license:

> Therefore, where a licensee with a most favored licensee clause seeks to replace what has become a less-favored lump-sum license payment with a later-granted, more favorable lump-sum payment, the only way to give meaning to the MFL clause is by retroactive substitution of the payment term. That is the outcome of the parties' contract here.[31]

The district court also held that J.P. Morgan could take advantage of the more favorable consideration term of the Cathay license, even if other aspects of the Cathay license were less favorable, but that the court "must consider Cathay's total package of consideration."[32] That package included Cathay's agreement to make additional payments to cover later-acquired assets based on specific formulas included in the Cathay license, which "would necessarily also have to be applied retroactively" to J.P. Morgan.[33] This created a factual dispute, however, because there was no evidence in the record as to whether any companies J.P. Morgan had

---

[30] *Id.* at 649-51.

[31] *Id.* at 653.

[32] *Id.* at 654.

[33] *Id.* at 654-55.

11

acquired after entering into the JPM License Agreement had used the covered patents, which would reduce the recovery by J.P. Morgan.[34]

On June 2, 2015, J.P. Morgan and DTC stipulated in the district court that DTC was "unable to raise a genuine dispute as to any material fact controverting [J.P. Morgan's] claim of $69 million in damages and that [J.P. Morgan] is entitled to judgment as a matter of law regarding damages."[35] That same day, the district court entered a final judgment awarding J.P. Morgan "damages of $69 million against DTC" (the "Judgment").[36]

On May 19, 2016, the United States Court of Appeals for the Fifth Circuit affirmed the Judgment.[37] The Fifth Circuit noted that "[t]he district court first concluded that DTC breached the contract because the MFL is self-executing . . . . DTC does not assign as error [this] conclusion, so it has waived any argument on [it]."[38] The court also emphasized that "DTC never even provided sufficient notice of its earlier breaches as required by the MFL clause."[39]

---

[34] *Id.* at 655.

[35] Compl. ¶ 36 (quoting Ex. F at 2).

[36] *Id.* Ex. G.

[37] *JP Morgan Chase Bank, N.A. v. DataTreasury Corp.*, 823 F.3d 1006, 1007 (5th Cir. 2016).

[38] *Id.* at 1010.

[39] *Id.* at 1019.

## F. Post-Judgment Discovery in the Texas Action

After the Judgment was entered in the Texas Action, J.P. Morgan served discovery on DTC and its attorneys asking them to identify dividends DTC had paid and other financial transactions.[40] DTC objected to producing or having any non-party produce such documents for the period before June 2011, contending they were irrelevant "because June 2011 is the date [J.P. Morgan] first notified DTC of a potential issue involving the most favored license clause."[41] For the time period after June 2011, DTC did produce some documents.

On April 13, 2017, during a meet and confer session, DTC's counsel revealed that after J.P. Morgan had made its post-Judgment discovery demands, DTC transferred its corporate documents to an office in Florida leased by VEEDIMS.[42] VEEDIMS abandoned the documents and permitted them to be destroyed by the building's landlord.[43]

J.P. Morgan subpoenaed the DTC Directors in the Texas Action, but they have produced no documents.[44] Despite a March 2017 court order requiring DTC to produce Lane for a deposition, DTC has not made him available for deposition,

---

[40] Compl. ¶ 44.

[41] *Id*. Ex. H at 1.

[42] *Id.* ¶ 45.

[43] *Id.*

[44] *Id.*

13

allegedly due to health concerns, and DTC has not offered any alternative witness to be deposed.[45]

On December 15, 2017, the district court denied J.P. Morgan's motion to compel the pre-June 2011 documents it sought.[46] That issue was on appeal in the Fifth Circuit as of the date the instant motion to dismiss was argued.[47]

Also on December 15, 2017, the district court ordered DTC to produce to J.P. Morgan by February 13, 2018 financial records concerning matters that occurred on or after June 1, 2011.[48] On the deadline, DTC produced seven documents, none of which provide any information as to whether DTC received consideration for the allegedly fraudulent transfers.[49] One document DTC did produce shows that DTC issued dividends totaling at least $117,148,242.07 between January 2002 and May 2013.[50] The Judgment remains unsatisfied.[51]

---

[45] *Id.*

[46] *Id.* Ex. H at 2.

[47] *Id.* ¶ 44.

[48] *Id.* ¶ 46 (citing Ex. H). The district court also ordered DTC to submit to twenty hours of deposition, but DTC moved for a stay and has continued to refuse to produce a witness. *Id.* ¶ 47.

[49] *Id.* ¶¶ 46, 72.

[50] *Id.* ¶ 52; *see also id.* ¶ 61 (citing Ex. I as containing an excerpt from a shareholder meeting presentation detailing the dividends paid by DTC, which was produced to J.P. Morgan on February 13, 2018).

[51] *Id.* ¶ 67.

## II.  PROCEDURAL HISTORY

On December 27, 2017, J.P. Morgan filed an earlier action in this court against the DTC Directors and Celestial Partners challenging as unlawful certain dividends DTC issued in 2011 and 2012.[52]  The DTC Directors filed an answer, and that case is in discovery.

On April 12, 2018, J.P. Morgan filed this action, which focuses on the Challenged Dividends and Challenged Transfers.  J.P. Morgan attempted to consolidate this action with its earlier action, but the defendants refused to consent to consolidation.[53]

The Complaint contains four claims.  Count I, which J.P. Morgan brings "individually and on behalf of other legitimate creditors" of DTC,[54] asserts that the DTC Directors and Celestial Partners, as the alter ego of Ballard, are liable, jointly and severally, for the amount of the Challenged Dividends because "DTC lacked sufficient surplus or net profits, and/or was otherwise insolvent or rendered insolvent by the payment of the dividends, in violation of" Sections 170, 172, 173, and 174 of the Delaware General Corporation Law.[55]  Count II asserts that the Challenged

---

[52] *JPMorgan Chase Bank, N.A. v. Ballard*, C.A. No. 2017-0923-AGB, Verified Compl. ¶¶ 81-87 (Dkt. 1).

[53] Tr. 54 (Oct. 16, 2018).

[54] Compl. at 45.

[55] *Id*. ¶ 114.  As discussed below, J.P. Morgan asserts in the alternative that the Challenged Dividends were fraudulent transfers.  *Id*. ¶ 117.

Transfers were fraudulent.[56]  Count III seeks an award of attorneys' fees incurred in connection with the investigation and prosecution of this action based on DTC's fraudulent transfers.[57]  In Count IV, which J.P. Morgan asserts as a judgment creditor of DTC, J.P. Morgan seeks to collect payment on a note for $1.5 million that VEEDIMS owes to DTC but has failed to pay.[58]

On May 25, 2018, the DTC Directors, Celestial Partners, and VEEDIMS moved to dismiss all the claims in the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief and, with respect to the fraudulent transfer claims, under Court of Chancery Rule 9(b) for failure to plead fraud with particularity.[59]  The remaining two defendants (Zaah Technologies, Inc. and Potens Partners LLC) have failed to appear in this case even though it appears they were served via their Delaware registered agents on May 2, 2018.[60]

On January 22, 2019, after hearing oral argument on the motion to dismiss, the court requested supplemental briefing on several issues concerning the six-year time limitation in 8 *Del. C.* § 174(a).  Supplemental briefing was completed on April 11, 2019.

---

[56] *Id.* ¶¶ 122-39.

[57] *Id.* ¶ 141.

[58] *Id.* ¶¶ 143-49.

[59] Dkt. 12.

[60] Dkt. 9.

## III. ANALYSIS

The standard governing a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief is well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[61]

Under Court of Chancery Rule 9(b), "the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally."[62]

Defendants raise a variety of arguments as to why this court should dismiss each of their claims. With respect to the Challenged Dividends, defendants assert that J.P. Morgan (i) is barred by judicial estoppel; (ii) lacks standing under Section 174; and (iii) is time-barred based on the six-year limitation period in Section 174. With respect to the Challenged Transfers, defendants assert J.P. Morgan's claim is untimely and inadequately pled. The court will examine these issues in that order before turning to defendants' arguments for dismissal of the claims against VEEDIMS and Celestial Partners.

---

[61] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citations and internal quotation marks omitted).

[62] Del. Ch. Ct. R. 9(b).

### A. J.P. Morgan's Unlawful Dividend Claims Are Not Barred by Judicial Estoppel

Defendants argue that J.P. Morgan's pursuit of claims in this court challenging dividends that DTC paid from 2006 to 2010 should be barred under the doctrine of judicial estoppel.[63] "Judicial estoppel applies when a litigant's position 'contradicts another position that the litigant previously took *and* that the Court was successfully induced to adopt in a judicial ruling.'"[64] Put another way, judicial estoppel "acts to preclude a party from asserting a position inconsistent with a position previously taken in the same or earlier legal proceeding" that the court was persuaded to accept.[65] "The 'persuaded to accept' element is important [because] parties raise many issues throughout a lengthy litigation and only those arguments that persuade the court can form the basis for judicial estoppel."[66]

According to defendants, J.P. Morgan should be judicially estopped because it obtained its Judgment in the Texas Action by "basing its breach claim upon pursuit of the more favorable price term of the *2012* Cathay license, and not any earlier

---

[63] Defendants also argued initially that J.P. Morgan's claims were barred by collateral estoppel, but that argument was withdrawn. Tr. at 52.

[64] *Motors Liqid. Co. DIP Lenders Tr. v. Allstate Ins. Co.*, 2018 WL 3360976, at *4 (Del. July 10, 2018) (emphasis added) (quoting *Siegman v. Palomar Med. Techs., Inc.*, 1998 WL 409352, at *3 (Del. Ch. July 13, 1998)).

[65] *Motorola Inc. v. Amkor Tech., Inc.*, 958 A.2d 852, 859 (Del. 2008).

[66] *Sheldon v. Pinto Tech. Ventures, L.P.*, 2019 WL 336985, at *5 (Del. Ch. Jan. 25, 2019) (internal quotation marks omitted).

license," but J.P. Morgan now is seeking to rely on licenses DTC entered into previously to establish that DTC breached the MFL Provision and that J.P. Morgan became a creditor of DTC before it paid out the Challenged Dividends beginning in 2006.[67] The fatal flaw in defendants' argument is that defendants have not identified any position J.P. Morgan advanced in the Texas Action that was adopted in a judicial ruling and that is contrary to any of their claims in this case.

In obtaining the Judgment in the Texas Action, J.P. Morgan relied on the Cathay license to determine its damages. It made sense for J.P. Morgan to do so because the amount Cathay paid for the license was relatively modest ($250,000) and J.P. Morgan could only use the more favorable terms of one license agreement to establish the amount of its damages. Critically, however, defendants have not identified any occasion when J.P. Morgan took the position in the Texas Action that DTC had not breached the MFL Provision before entering into the Cathay license (*e.g.*, by failing to provide notice to J.P. Morgan of earlier licensing agreements containing more favorable terms than the JPM License Agreement), or that J.P. Morgan was not a creditor of DTC before the Cathay license. Indeed, in affirming the district court's damages award, the Fifth Circuit expressly recognized that there

---

[67] Defs.' Opening Br. 18.

were "earlier breaches" of the MFL Provision than DTC's failure to provide notice of the 2012 Cathay license.[68]

It is true, as defendants point out, that the district court denied J.P. Morgan the opportunity to take post-Judgment discovery in the Texas Action for pre-June 2011 events.[69] But that ruling was not based on a position J.P. Morgan advanced. Rather, the district court declined to order production of pre-June 2011 matters based on the arguments advanced *by DTC*.[70] J.P. Morgan sought discovery in the district court for events dating back to 2006, and has appealed to the Fifth Circuit the district court's refusal to permit such discovery.[71]

In short, defendants' judicial estoppel defense fails because they have not identified any position J.P. Morgan advanced in the Texas Action that any court relied on in making a ruling that is inconsistent with a position J.P. Morgan has advanced in this case.

---

[68] *JP Morgan Chase Bank*, 823 F.3d at 1019 ("DTC never even provided sufficient notice of its earlier breaches as required by the MFL clause.").

[69] Defs.' Opening Br. 15-16.

[70] *See* Compl. Ex. H at 2 ("The Court agrees with DTC. DTC first had notice of any potential claim by [J.P. Morgan] in June 2011, when [J.P. Morgan] notified DTC of its potential claim under the most-favored license clause. . . . Further, allowing discovery and production of documents concerning matters that occurred before June 1, 2011 would not be reasonable or proportional to the needs of this case.").

[71] *See id.* at 1 (stating that J.P. Morgan's "primary argument is that it is entitled to conduct a broad inquiry into DTC's pre-judgment disposal of its assets and their current location in order to satisfy its Judgment and that discovery between 2006 and 2011 is proportional, reasonable, and proper").

**B. J.P. Morgan Has Standing to Pursue Its Unlawful Dividend Claims on Behalf of Itself and DTC's Other Creditors**

Defendants argue that J.P. Morgan does not have standing to pursue its unlawful dividend claims under 8 *Del. C.* § 174. In relevant part, Section 174 provides that:

> In case of any wilful or negligent violation of § 160 or § 173 of this title, the directors under whose administration the same may happen shall be jointly and severally liable, at any time within 6 years after paying such unlawful dividend or after such unlawful stock purchase or redemption, to the corporation, and ***to its creditors in the event of its dissolution or insolvency***, to the full amount of the dividend unlawfully paid, or to the full amount unlawfully paid for the purchase or redemption of the corporation's stock, with interest from the time such liability accrued.[72]

As the text emphasized above makes clear, in the event of a corporation's insolvency, the "creditors" of the corporation may obtain a recovery from the directors personally if they willfully or negligently violated Section 173. That section prohibits the payment of dividends that do not comply with other provisions of the Delaware General Corporation Law, including the requirement to pay dividends out of surplus or net profits. Thus, as a logical matter, only someone who is a "creditor" within the meaning of the statute can have standing to bring such a claim.

---

[72] 8 *Del. C.* § 174(a) (emphasis added).

Defendants argue that J.P. Morgan was not a "creditor" and thus "does not have standing to challenge dividends issued by DTC in years 2006 through 2010" because J.P. Morgan "did not become a judgment creditor of DTC until 2015."[73] In other words, defendants contend that one must have a *judgment* in hand to be a "creditor" under Section 174.

J.P. Morgan argues in response that the term "creditor" in Section 174 should be construed more broadly to mean someone who has a "claim." Applying the statute in this manner, J.P. Morgan contends as a factual matter that it was a creditor for purposes of Section 174 once DTC entered into a license with terms more favorable than the JPM License Agreement given the self-executing nature of the MFL Provision. The court agrees with J.P. Morgan.

The term "creditor" is not defined in Section 174, and only one case has been identified that touches on the issue—our Supreme Court's 1985 decision in *Johnston v. Wolf*.[74] In that case, the Supreme Court considered whether three individuals (Johnston, Praught, and Baron) had standing under Section 174 to challenge the redemption of preferred stock by a company ("pre-merger Allied") that subsequently was merged into "New Allied." In analyzing that question for two of the plaintiffs (Johnston and Praught) whom the high court characterized as "creditors of New

---

[73] Defs.' Opening Br. 32.
[74] 487 A.2d 1132 (Del. 1985).

22

Allied on account of certain trade indebtedness" it owed to them, the Supreme Court concluded that they were not "'*creditors*' of pre-merger Allied within the meaning of 8 *Del. C.* § 174 because, in fact, they did not have a *claim* against pre-merger Allied when it went out of existence."[75] In other words, although it did not directly analyze the meaning of the term "creditor" under Section 174, the Supreme Court appeared to equate the term "creditor" to having a "claim" even though the claim had not been reduced to a judgment.[76]

Focusing on the third individual in *Johnston* (Baron) who sought standing to bring a claim under Section 174, defendants argue that the Supreme Court suggested that one must have a judgment to be a "creditor" under the statute. The court disagrees. Baron was differently situated than the other two plaintiffs in *Johnston*: Baron asserted that he was a creditor based on a "judgment for fees and expenses" he had obtained in the Court of Chancery while, as noted above, the other two plaintiffs (Johnston and Praught) based their Section 174 claim on "certain trade indebtedness" owed to them.[77] Importantly, in rejecting Baron's standing argument, the Supreme Court never opined that it was necessary to hold a judgment in order to

---

[75] *Id.* at 1136 (emphasis added).

[76] *Id.*; *see also ProtoComm Corp. v. Novell, Inc.*, 55 F. Supp. 2d 319, 330 (E.D. Pa. 1999) (construing *Johnston* to hold that "two of the plaintiffs [Johnston and Praught] were not 'creditors' under § 174 because they did not have a claim against the company before the merger occurred").

[77] *Johnston*, 487 A.2d at 1135-36.

23

be a creditor under Section 174. It simply concluded that the judgment Baron held, which was the basis for his Section 174 claim,[78] failed to give him standing against pre-merger Allied because the judgment was obtained after the merger: "We hold that Baron nevertheless lacks standing since the judgment on which he relies was not obtained until after the merger."[79]

This timing issue was the central holding of *Johnston* with respect to all three of the plaintiffs, *i.e.*, that they were not entitled to recover because they were not creditors at the time of the payment they sought to challenge.[80] But the important point for purposes of this case is that the Supreme Court tacitly suggested in its analysis that having a claim that had not been reduced to a judgment as of the time of the challenged payment would be sufficient to recover as a "creditor" under Section 174. Significantly, two other areas of Delaware law also support construing

---

[78] *Id.* at 1135 ("[I]t is on that judgment Baron now relies to establish that he was a creditor of pre-merger Allied.").

[79] *Id.* at 1136; *see also id.* at 1137 ("Baron had no standing to bring this action under 8 *Del. C.* § 174(a) [because] he was not a creditor of pre-merger Allied as of the date of the merger.").

[80] *See* 1 R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corporations and Business Organizations* § 5.32 (3rd ed. 2019 update) (citing *Johnston* for the proposition that "[a] creditor who was not such at the time of the unlawful payment is not within the protected class of creditors entitled to recover"); Barbara Black, *Corporate Dividends and Stock Repurchases* § 4.5 (Nov. 2018 update) ("In *Johnston v. Wolf*, the Delaware Supreme Court held that the statute protected only creditors at the time of the illegal distribution."); 3A William Mead Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 1217 (April 2019 update) (citing *Johnston* for the proposition that "creditors of a successor corporation do not have standing to sue for the predecessor's redemption of shares in violation of statute, when they were never creditors of the predecessor corporation").

the term "creditor" as someone with a "claim," as well as generally construing the term "creditor" broadly.

In *Mackenzie Oil Co. v. Omar Oil & Gas Co.*,[81] for example, this court held long ago that "a simple contract creditor whose claim is evidenced by promissory notes" had standing as a "creditor" under a statute authorizing the court to appoint a receiver for an insolvent corporation "on the application of a 'creditor.'"[82] In reaching this conclusion, the court explained that "[t]he word 'creditor' is a term of very broad meaning" that had been "defined as to embrace, not alone judgment or lien creditors, but as well general or simple contract creditors, or creditors at large."[83]

Additionally, the Delaware Uniform Fraudulent Transfer Act ("DUFTA") defines a "creditor" as someone "who has a claim."[84] The statute in turn defines the term "claim" broadly to mean "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."[85] Notably, although

---

[81] 120 A. 852 (Del. Ch. 1923).

[82] *Id.* at 854-55. The statute in question, which was the predecessor of 8 *Del. C.* § 291, provided, in relevant part, that: "Whenever a corporation shall be insolvent, the Chancellor, on the application and for the benefit of any creditor or stockholder thereof, may, at any time, in his discretion, appoint one or more persons to be receivers of and for such corporation." *Id.* at 852.

[83] *Id.* at 854.

[84] 6 *Del. C.* § 1301(4).

[85] *Id.* § 1301(3).

the statutes operate differently, DUFTA and Section 174 have a similar purpose—both are designed to protect creditors of a corporation from distributions of corporate funds viewed as inappropriate because they undermine the ability of the corporation to repay its debts.[86]

In light of the above authorities, all of which support construing the term "creditor" broadly to encompass claims for the purpose of determining who can recover under statutes designed to protect creditors, the court holds that J.P. Morgan has pled facts sufficient to establish it has standing to assert claims on behalf of itself and other creditors under Section 174 dating back to 2006 even though it did not obtain its Judgment until 2015. This conclusion is supported by (i) the "self-executing" nature of the MFL Provision, whereby J.P. Morgan became contractually entitled to the benefit of more favorable license terms when DTC entered into another license for the same patents on such terms,[87] and (ii) the Complaint's allegations that DTC licensed its patents to NCR Corporation in January 2006 for

---

[86] *See* 6 *Del. C.* § 1304(a) (defining a fraudulent transfer under DUFTA as one where "the debtor made the transfer . . . with actual intent to hinder, delay or defraud any creditor of the debtor"); 8 *Del. C.* § 174(a) (holding directors liable "to [a corporation's] creditors in the event of its dissolution or insolvency, to the full amount of the dividend unlawfully paid").

[87] *See JP Morgan Chase Bank*, 79 F. Supp. 3d at 650 ("DTC's assertion that the MFL clause is not self-executing . . . is without merit."); *see also JP Morgan Chase Bank*, 823 F.3d at 1010 ("The district court first concluded that DTC breached the contract because the MFL is self-executing . . . . DTC does not assign as error [this] conclusion, so it has waived any argument on [it].").

$2.85 million, a fraction of the $70 million J.P. Morgan agreed to pay to license the same patents, $30 million of which was paid up front.[88]

## C. The Unlawful Dividend Claims for 2006-2010 Are Not Timely

Defendants next argue that J.P. Morgan's unlawful dividend claims are untimely based on the six-year limitations period set forth in Section 174. The part of the statute relevant to this argument provides that "the directors . . . shall be jointly and severally liable, *at any time within 6 years after paying such unlawful dividend or after such unlawful stock purchase or redemption.*"[89] It is not disputed that more than six years elapsed between the date DTC paid the last of the dividends that J.P. Morgan challenges in this action (in 2010) and the date that J.P. Morgan filed its Complaint in this action (in April 2018).

J.P. Morgan contends that the six-year period in Section 174 is a statute of limitations that can and should be tolled under the doctrines of (i) inherently unknowable injuries, (ii) fraudulent concealment, and (iii) equitable tolling. According to J.P. Morgan, the six-year period in Section 174 should be tolled until at least February 13, 2018, because DTC—"a closely held corporation not subject to SEC reporting requirements"—concealed from J.P. Morgan the payment of

---

[88] Compl. ¶¶ 22-23 (alleging that J.P. Morgan "paid the $70 million license fee during the course of several years: $30 million up front, with the remainder paid in annual installments through May 31, 2012").

[89] 8 *Del. C.* § 174(a) (emphasis added).

27

dividends from 2006 to 2010 until DTC was forced to disclose that information "under compulsion of [a] court order on February 13, 2018."[90]  If the six-year period is tolled until February 13, 2018, J.P. Morgan's unlawful dividend claims under Section 174 would be timely.

Defendants advance two arguments in response:  first, that the six-year time period in Section 174 is a statute of repose to which tolling principles do not apply, and second, that even if the six-year time period is a statute of limitations that is subject to tolling doctrines, J.P. Morgan is not entitled to tolling for various reasons. Because the first issue is dispositive, the court does not reach the second issue.

Whether the six-year provision in Section 174 is a statute of limitations or a statute of repose is a question of first impression.  None of the parties has identified any authority that has decided this question.

Both parties suggest that the Third Circuit in *EBS Litigation LLC v. Barclays Global Investors, N.A.*[91] viewed the six-year time period in Section 174 to be a statute of limitations.[92]  I do not read *EBS* that way.  *EBS* involved an appeal of the dismissal of a third-party complaint filed on March 29, 2000, in an adversary action arising out of a bankruptcy proceeding.  The third-party complaint asserted, among other

---

[90] Pl.'s Opp'n Br. 39-41.

[91] 304 F.3d 302, 306 (3d Cir. 2002).

[92] Defs.' Opening Br. 40-41; Pl.'s Opp'n Br. 37.

things, that the former directors of Edison Brothers Stores, Inc. breached their fiduciary duties by distributing a stock dividend on June 29, 1995, *i.e.*, less than five years before the third-party complaint was filed.[93] The Third Circuit noted that "[a]ll parties agree that the statute of limitations for the alleged breaches of fiduciary duty and related offenses is three years," and thus "expired on June 29, 1998, unless the statue was tolled during part or all of that period."[94] The statute of limitations to which the parties were referring, however, logically would have been the three-year statute of limitations in 10 *Del. C.* § 8106, which governs claims for breach of fiduciary duty,[95] and not the six-year period referenced in Section 174.

In making the point that "[i]f the stock dividend occurred when Edison was insolvent, or rendered insolvent, it was illegal under Delaware law, and voidable in bankruptcy," the Third Circuit quoted Section 174 but never analyzed whether the six-year time period therein was a statute of limitations or one of repose.[96] Indeed, that time period was irrelevant because the challenged stock dividend occurred within six years of the filing of the third-party complaint at issue in *EBS*.[97]

---

[93] *EBS*, 304 F.3d at 304-05.

[94] *Id.* at 305.

[95] *See In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *4 (Del. Ch. July 17, 1998) ("It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty."), *aff'd*, 725 A.2d 441 (Del. 1999).

[96] *EBS*, 304 F.3d at 305-06.

[97] In *Territory of U.S. Virgin Islands v. Goldman, Sachs & Co.*, 937 A.2d 760, 794 (Del. Ch. 2007), the court commented that Section 174 "provides for a cause of action against

The United States Supreme Court recently described the difference between statutes of limitation and statutes of repose in *California Public Employees' Retirement System v. ANZ Securities, Inc.*[98] as follows:

> [S]tatutory time bars can be divided into two categories: statutes of limitations and statutes of repose. Both are mechanisms used to limit the temporal extent or duration of liability for tortious acts, but each has a distinct purpose.
>
> Statutes of limitations are designed to encourage plaintiffs to pursue diligent prosecution of known claims. In accord with that objective, limitations periods being to run when the cause of action accrues—that is, when the plaintiff can file suit and obtain relief. In a personal-injury or property-damage action, for example, more often than not this will be when the injury occurred or was discovered.
>
> In contrast, statutes of repose are enacted to give more explicit and certain protection to defendants. These statutes effect a legislative judgment that a defendant should be free from liability after the legislatively determined period of time. For this reason, statutes of repose begin to run on the date of the last culpable act or omission of the defendant.[99]

---

the directors authorizing the dividends, with specific proof requirements, and contains a six-year limitations period." The issue before the court concerned distributions made from a dissolved corporation, which implicated Sections 278 and 325(b) of the Delaware General Corporation Law. The case did not involve a claim under Section 174, and the court did not analyze whether the six-year limitations period in Section 174 was a statute of limitations or one of repose. *Id.* at 794-95; *see also Fotta v. Morgan*, 2016 WL 775032, at \*12 (Del. Ch. Feb. 29, 2016) (referring to the "six-year statute of limitation set out in Section 174" without analyzing whether the provision was a statute of limitation or one of repose).

[98] 137 S. Ct. 2042 (2017).

[99] *Id.* at 2049 (internal quotation marks and citations omitted); *see also CTS Corp. v. Waldburger*, 573 U.S. 1, 7-8 (2014) ("Although there is a substantial overlap between the policies of the two types of statute, each has a distinct purpose and each is targeted at a different actor.").

The Supreme Court further explained that "[t]he purpose and effect of a statute of repose . . . is to override customary tolling rules arising from the equitable powers of courts" because the "object of a statute of repose [is] to grant complete peace to defendants."[100]

In Delaware, our own Supreme Court explained the difference between a statute of limitations and a statute of repose in *Cheswold Volunteer Fire Co. v. Lambertson Construction Co.*[101] as follows:

> While the running of a statute of limitations will nullify a party's remedy, the running of a statute of repose will extinguish both the remedy and the right. The statute of limitations is therefore a procedural mechanism, which may be waived. On the other hand, the statute of repose is a substantive provision which may not be waived because the time limit expressly qualifies the right which the statute creates.[102]

In providing this explanation, the high court cited to a New York state court decision, which states, in relevant part:

> [W]here, as here, a statute creates a right unknown at common law, and also establishes a time period within which the right may be asserted, the time limit is a substantive provision which "qualifies" the right in effect, a condition attached to the right as distinguished from a statute of limitation which must be asserted by way of defense. But to ascertain whether the substantive time limitation is to be applied rigidly, without exception, as respondent asserts, or whether there are

---

[100] *ANZ Secs.*, 137 S. Ct. at 2051-52; *see also IMO Estate of Lambeth*, 2018 WL 3239902, at *3 (Del. Ch. July 2, 2018) ("This Court and the United States Supreme Court have explained that statutes of repose are not subject to tolling doctrines sourced in equity.").

[101] 489 A.2d 413 (Del. 1984).

[102] *Id.* at 421.

circumstances under which it may be tolled or extended, we must look to the statute itself and its purpose to determine the Congressional intent.[103]

Given *Cheswold*'s reliance on authorities focusing on the context in which a limitations period is adopted, the court requested that the parties submit supplemental briefing to address "[t]he legislative history of Section 174 and, in particular, the purpose of the six-year time period in Section 174(a)."[104] A summary of that history is set forth next.

The first statutory provision in Delaware for recovering an unlawful dividend was enacted in 1875 as part of Delaware's first general corporation act. The 1875 Act was silent as to any time limit for asserting an unlawful dividend claim, but it expressly provided that the claim may be enforced by a common law debt action:

> [I]t shall be unlawful for any board of directors or managers of any company incorporated by the provisions of this act, to declare dividends

---

[103] *Lincoln First Bank of Rochester v. Rupert*, 400 N.Y.S.2d 618, 619 (N.Y. App. Div. 1977) (internal citations omitted); *see also Romano v. Romano*, 227 N.E.2d 389, 391 (N.Y. 1967) ("If a statute creates a cause of action and attaches a time limit to its commencement, the time is an ingredient of the cause. If the cause was cognizable at common law or by other statute law, a statutory time limit is commonly taken as one of limitations and must be asserted by way of defense."); *Kahn v. Trans World Airlines, Inc.*, 443 N.Y.S.2d 79, 82 (N.Y. App. Div. 1981) ("[T]he general rule in New York for distinguishing between conditions precedent and Statutes of Limitation may be stated as follows: If the statute containing the time limitation *creates* the cause of action, then the limitation will generally be regarded as an ingredient of the cause of action and, thus, a condition precedent to suit. If, on the other hand, the cause of action was cognizable at common law or is made such by virtue of another or different statute, then a validly enacted time limitation will generally be regarded as a mere Statute of Limitations, which may, if pleaded, preclude enforcement of the remedy, but does *not* extinguish the right.").

[104] Dkt. 42.

out of the capital stock of said company, and for a breach of this clause, those who assent thereto shall be liable, jointly or severally, to the creditors of the company, to the extent to which the capital stock has been encroached upon or impaired by such dividend, *and such liability may be enforced by an action of debt*, to be brought in the name of any one or more creditors of the company . . . .[105]

When the 1875 Act was adopted, a debt action was governed by a three-year statute of limitations,[106] which was the precursor of 10 *Del. C.* § 8106.[107] This limitations period was capable of being tolled.[108]

The 1875 Act was repealed and replaced with a new general corporation act in 1883. The six-year period for recovering an unlawful dividend from directors personally found today in Section 174 of the Delaware General Corporation Law appeared for the first time in Section 7 of the 1883 Act, and has been in place continuously since then:[109]

---

[105] 15 Del. Laws ch. 119, § 10 (1875) (emphasis added).

[106] *Del. C. 1852*, § 2742 (1852) (providing that "no action of debt . . . shall be brought after the expiration of three years from the accruing of the cause of such action" subject to certain exceptions); *see also Dodd v. Wilson*, 4 Del. Ch. 399, 400 (1872) ("The limitation of three years will be applied in equity to a claim for relief by a decree for the repayment of money paid for the use of the defendant, by analogy to the statutory period of limitation against simple contract debts, in actions at law."). This statute remained unchanged through at least 1915. *See Del. C. 1915*, § 4671 (1915) (containing the same text as Section 2742 of the 1852 code and indicating that the provision came directly from the 1852 code without modification).

[107] *See* 10 *Del. C.* § 8106 (tracing the provision's history back to *Del. C. 1852*, § 2742).

[108] *See Del. C. 1852*, §§ 2750-51 (allowing for tolling in specific instances such as when the plaintiff is out of state or is a minor).

[109] *See* 8 *Del. C.* § 174; 71 Del. Laws ch. 339, §§ 26, 27 (1998); 59 Del. Laws ch. 106, § 6 (1973); 56 Del. Laws ch. 50, § 174 (1967); 8 *Del. C. 1953* § 174; 41 Del. Laws ch. 130, § 1 (1937); 21 Del. Laws ch. 273, § 18 (1898); 17 Del. Laws ch. 147, § 7 (1883) (unlawful

It shall not be lawful for the directors of any bank or moneyed or manufacturing corporation in this State, or any corporation created under this act, to make dividends, except from the surplus or net profits arising from the business of the corporation . . . and, in case of any violation of the provisions of this section, the directors, under whose administration the same may happen, shall, in their individual capacities, jointly and severally, *be liable at any time within the period of six years after paying any such dividends to the said corporation*, and to the creditors thereof in the event of its dissolution or insolvency, to the full amount of the dividend made . . . .[110]

Section 7 of the 1883 Act dropped the reference in the prior statute to enforcing an unlawful dividend claim "by an action of debt" and was silent on the means of its enforcement, although Section 41 of the 1883 Act permitted an "action on the case" "[w]hen any of the officers or directors of any company, or stockholders thereof, shall be liable by the provision of this act to pay the debts of such company."[111]

An action on the case was a general cause of action at common law to obtain a remedy where the conduct did not fall into another recognized cause of action.[112]

---

dividend statutes passed from the present back to 1883, all containing a six-year period from when the dividend was paid to bring a claim).

[110] 17 Del. Laws ch. 147, § 7 (1883) (emphasis added).

[111] *Id.* § 41. This Section was the precursor to 8 *Del. C.* § 325. *See* 1 David A. Drexler et al., *Delaware Corporation Law & Practice* § 20.06, at 20-13 n.8 (2018 update) (explaining that the Superior Court in *John A. Roebling's Sons Co. v. Mode* (discussed below) "also disagreed with the creditor that the predecessor to Section 325 would permit such a suit").

[112] *See Trespass*, Black's Law Dictionary (11th ed. 2019) (stating that "action on the case" is another term for "trespass on the case," which is defined as "[a]t common law, a lawsuit to recover damages that are not the immediate result of a wrongful act but rather a later consequence").

As the Delaware Superior Court explained in *Wise v. Western Union Telephone Co.*:[113]

> Succinctly, therefore, where there exists a legal right on one side and a legal wrong on the other, accompanied by damage, the action of Case will furnish a remedy where no specific remedy exists.[114]

When the 1883 Act was adopted, an action on the case was governed by the same three-year statute of limitations that governed debt actions.[115]

In February 1899, a three-judge panel of the Delaware Superior Court issued an important decision interpreting the unlawful dividend provision of the 1883 Act in *John A. Roebling's Sons Co. v. Mode*.[116] The core issue before the court in *Roebling's* concerned whether a judgment creditor could recover the amount of its judgment individually from a corporate director of an insolvent corporation based on the payment of an illegal dividend instead of seeking a recovery for the corporation of the entire illegal dividend. The court concluded that it could not:

> [Section 7] contemplates the recovery and restoration to the capital of the corporation of the entire amount thus illegally withdrawn, and, to that end, each director is made individually liable for such amount. When so recovered and restored, whether at the instance and in the name of the corporation primarily, or in the name and at the instance of the creditors, it becomes at once a part of the capital stock again, to be held and disposed of as such for the benefit of all concerned.

---

[113] 172 A. 757 (Del. Super. Ct. 1934).

[114] *Id.* at 758.

[115] *Del. C. 1852*, § 2742.

[116] 43 A. 480 (Del. Super. Ct. 1899).

* * * * *

We are unable to find anything in section 7 that will enable the plaintiff in this action on the case, or in any other common-law action, separately to sue for and recover his individual claim against the defendant. If this be a common fund, the remedy would be by proceedings in equity, where all persons interested would be made parties, and the rights and liabilities of each one could be fully considered and equitably adjusted.[117]

Having concluded that the relief afforded under Section 7 ran to the corporation, and for distribution to all creditors in the event of insolvency, the *Roebling's* court further determined "that the remedy by action on the case provided by section 41 [of the 1883 Act] does not apply to cases arising under section 7, and that provisions of section 7 can only adequately and properly be enforced by proceedings in equity."[118] In reaching this conclusion, the court expressed concern that it would be "unreasonable and inequitable" to use Section 41 to hold a director liable under Section 7 because the director then would be entitled to be reimbursed by the corporation under another provision of the 1883 Act, Section 42,[119] which

---

[117] *Id.* at 481-82.

[118] *Id.* at 483.

[119] Section 42 of the 1883 Act provided that: "Any officer, director, or stockholder of a company who shall pay any debt of the company for which he is made liable by the provisions of this act, may recover the amount so paid in an action against the company, for money paid for their use, in which action the property of the company only shall be liable to be taken." 17 Del. Laws ch. 147, § 42 (1883).

36

would defeat the intent of Section 7 that directors be held personally liable for paying unlawful dividends.[120]

Less than five weeks after *Roebling's* was decided, its holdings were overturned by the adoption of the General Corporation Act of 1899. Specifically, the unlawful dividend provision in the 1883 Act was modified in the 1899 Act to state expressly that the provision could be enforced in an action on the case and that it could be enforced for the benefit of a single creditor by adding the words "or any of them,"[121] while keeping the six-year time period intact:

> No corporation created under the provisions of this Act, nor the directors thereof, shall make dividends except from the surplus or net profits arising from its business . . . and in case of any violation of the provisions of this section, the directors under whose administration the same may happen shall be jointly and severally *liable **in an action on the case** at any time within six years after paying such dividend to the corporation and its creditors **or any of them** in the event of its dissolution or insolvency, to the full amount of the dividend made . . .* .[122]

---

[120] *See Roebling's*, 43 A. at 483 ("It is equally clear that the action on the case provided by section 41 does not apply to such restored capital, whether the restoration be made to the company or to the creditors. In the absence of express provision, it would seem to be unreasonable and inequitable to hold that when a director had participated in declaring, paying, and receiving illegal and unearned dividends, and under section 41 has been compelled to restore the same to the creditors of the company, he might then turn round, under section 42, and recover back the amount from the company, as money paid for its use.").

[121] *See Rockwood v. Foshay*, 66 F.2d 625, 628 (8th Cir. 1933) ("The action on the case was provided to meet the decision in the Roeblings Case, and a right of action was lodged in a single creditor by the words 'or any of them.'").

[122] 21 Del. Laws ch. 273, § 18 (1899) (emphasis added).

In 1937, the unlawful dividend statute was amended to remove the reference to an action on the case and to reinstate *Roebling's* prohibition on individual creditor actions"[123] by removing the "or any of them" language from the 1899 Act:

> No corporation created under the provisions of this Chapter, nor the Directors thereof, shall pay dividends upon any shares of the corporation except in accordance with the provisions of this Chapter. . . . *In case of any willful or negligent violation of the provisions of this Section, the Directors under whose administration the same may happen shall be jointly and severally liable, at any time within six years after paying such unlawful dividend, to the corporation and to its creditors, in the event of its dissolution or insolvency, to the full amount of the dividend so unlawfully paid . . . .*[124]

The substance of the provision in the 1937 statute (italicized above) affording a period of six years after payment to assert a claim for willful or negligent violations of the restrictions on paying dividends, which now resides in Section 174, has been materially unchanged since 1937.[125]

---

[123] 1 Drexler § 20.06, at 20-14.

[124] 41 Del. Laws ch. 130, § 1 (1937) (emphasis added).

[125] *See* 41 Del. Laws ch. 130, § 1 (1937); 8 *Del. C. 1953* § 174 (1953); 56 Del. Laws ch. 50, § 174 (1967); 59 Del. Laws ch. 106, § 6 (1973); 71 Del. Laws ch. 339, §§ 26, 27 (1998); 8 *Del. C.* § 174. In 1967, Section 174 was broadened to apply to willful and negligent violations of Section 160, which governs repurchases and redemptions of stock, in addition to unlawful dividend claims. *See* 56 Del. Laws ch. 50, §§ 160, 174. This was the first time that an express statutory time period was imposed on unlawful stock repurchase or redemption claims. *See id.*; 8 *Del. C. 1953*, §§ 160, 174 (1953) (not containing any limitation period); 25 Del. Laws ch. 154, § 1 (1909) (establishing for the first time that a corporation had the power to purchase its own shares provided doing so would not "cause any impairment of the capital of the corporation").

Having reviewed the legislative history of Delaware's unlawful dividend statute, the court turns to the parties' positions based on that history.

J.P. Morgan argues that "Section 174 did not create a new right; it merely *reiterated* creditors' long-existing common law right to hold directors liable for impairing corporate capital through dividends," as, "in essence, a breach of trust."[126] An early expression of this common law right is Justice Story's 1824 opinion in *Wood v. Dummer*, holding that capital stock is a trust fund that "may be followed by the creditors into the hands of any persons, having notice of the trust attaching to it."[127] J.P. Morgan points out that a number of courts followed suit and, inspired by the trust fund doctrine, allowed the maintenance of an unlawful dividend-type claim in the late 1800's and early 1900's at common law.[128] In essence, J.P. Morgan's

---

[126] Defs.' Suppl. Opp'n Br. 4, 10.

[127] 30 F. Cas. 435, 437 (C.C.D. Me. 1824); *see also Upton v. Tribilcock*, 91 U.S. 45, 47 (1875) (adopting the trust fund doctrine and stating that "[t]he capital stock of a moneyed corporation is a fund for the payment of its debts. It is a trust fund, of which the directors are the trustees. It is a trust to be managed for the benefit of its shareholders during its life, and for the benefit of its creditors in the event of its dissolution").

[128] *See, e.g.*, *Jesson v. Noyes*, 245 F. 46, 49 (9th Cir. 1917) (finding that dividends paid out of capital gave rise to "a cause of action at common law" under Alaska law); *Loan Soc'y of Philadelphia v. Eavenson*, 94 A. 121, 124-25 (Pa. 1915) ("[I]f directors who are quasi trustees for the company improperly pay away the assets to the shareholders, they are liable to replace them."); *Boyd v. Schneider*, 131 F. 223, 227 (7th Cir. 1904) ("It seems clear to us that [by declaring dividends out of capital stock], the directors are answerable in some kind of action, directly to the persons to whom their duty ran . . . ."); *Excelsior Petroleum Co. v. Lacey*, 63 N.Y. 422, 426 (N.Y. 1875) (acknowledging that "an action at common law, without the aid of statute" could be brought against the directors in an unlawful dividend case); *Gratz v. Redd*, 43 Ky. 178, 195 (Ky. 1843) (applying the trust fund doctrine in an unlawful dividend case and stating that it is "unquestionable" that "the Directors

39

argument boils down to the contention that, because this common law tradition predated the enactment of the statutory provision that is now Section 174, the adoption of a six-year time period in Section 174 did not qualify the creation of a new right and thus must be a statute of limitations rather than one of repose. J.P. Morgan also points out that other statutes of repose use language that more explicitly qualifies the right to recover.

Defendants counter that the court's analysis should begin and end with the language of Section 174, which they contend reads like a statute of repose because it does not use the type of "accrual" language contained in most Delaware statutes of limitation.[129] According to defendants, in the absence of such accrual language, the act of paying an unlawful dividend is an "objective trigger" from which the six-year statute of repose period starts to run.[130] Defendants argue further that if the court was to look beyond the plain language of the statute, the history of the unlawful dividend statute in Delaware shows that the legislature was seeking to implement a statute of repose in this instance.

---

might be rendered personally liable for a fraudulent breach of trust, or gross negligence, or a faithless misappropriation of the trust fund placed in their hands").

[129] *See, e.g.*, 10 *Del. C.* § 8106 (indicating that no action "shall be brought after the expiration of 3 years from the accruing of such action").

[130] Defs.' Opening Br. 37.

The court agrees with defendants that Section 174 should be read as a statute of repose rather than a statute of limitations. This conclusion is supported by the plain language of the statute and confirmed by its legal history.

Starting with the text of Section 174, the rules of statutory construction under Delaware law are well settled:

> First, we must determine whether the statute is ambiguous. If it is unambiguous, then there is no room for judicial interpretation and the plain meaning of the statutory language controls. The statute is ambiguous if it is susceptible of two reasonable interpretations or if a literal reading of its terms would lead to an unreasonable or absurd result not contemplated by the legislature. If the statute is ambiguous, then we consider it as a whole and we read each section in light of all the others to produce a harmonious whole.[131]

For a statute containing a time bar, our Supreme Court's decision in *Cheswold* also invites consideration of the legal history of the statute, if it is ambiguous, to determine whether the statute created a right unknown at common law such that the adoption of a time limit should be considered a non-waivable qualification of the right.[132] In that vein, when interpreting Delaware's appraisal statute, our Supreme Court recognized that "'[t]he legal history of a statute, including prior statutes on the same subject, is a valuable guide for determining what object an act is supposed to

---

[131] *CML V, LLC v. Bax*, 28 A.3d 1037, 1041 (Del. 2011) (internal quotation marks omitted).

[132] *See supra* n.102-03 and accompanying text.

41

achieve' because frequently legislative enactments are not accompanied by a contemporaneous Commentary."[133]

Here, the plain language of Section 174 demonstrates that it was intended to be a statute of repose. The critical language in the statute provides that: "*In case of any wilful or negligent violation* of . . . *§ 173 of this title*, the directors under whose administration the same may happen shall be jointly and severally liable, *at any time within 6 years after paying such unlawful dividend.*"[134] Section 173 provides that "[n]o corporation shall pay dividends except in accordance with this chapter,"[135] *i.e.*, the Delaware General Corporation Law.[136] Section 170, in turn, provides in general terms that dividends may be paid only out of the corporation's "surplus" or "net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year."[137] Thus, because the six-year time limit in Section 174 expressly qualifies the right that Section 174 creates to hold directors personally liable for willful or

---

[133] *Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 495 (Del. 2000) (quoting 2A Norman F. Singer, *Sutherland Statutory Construction* § 48.03 at 315 (5th ed. 1992)).

[134] 8 *Del. C.* § 174(a) (emphasis added).

[135] *Id.* § 173.

[136] Chapter 1 of Title 8 of the Delaware Code is the Delaware General Corporation Law.

[137] 8 *Del. C.* § 170(a).

negligent violations of Section 173, it is a substantive provision that cannot be waived under our Supreme Court's teaching in *Cheswold*.[138]

This interpretation is supported by the fact that the six-year period in Section 174 during which directors can be liable for an unlawful dividend is tied, not to the accrual of a cause of action, but rather to the payment of a dividend. As the United States Supreme Court explained in *ANZ Securities*, the major distinguishing factor of a statute of repose is that the limitations period "begin[s] to run on the date of the last culpable act or omission of the defendant."[139] Indeed, according to the Supreme Court, "this point is close to a dispositive indication that the statute is one of repose."[140]

Delaware courts have focused on this distinction in determining whether a time bar is a statute of repose or a statute of limitations. For example, in *City of Dover v. International Telephone & Telephone Corp.*,[141] the Supreme Court reaffirmed its decision in *Cheswold* that the Delaware Builder's Statute, 10 *Del. C.* § 8127,[142] is a statute of repose because "[t]he limitations period begins to run at the

---

[138] 489 A.2d at 421 (holding that "the statute of repose is a substantive provision which may not be waived because the time limit expressly qualifies the right which the statute creates").

[139] *ANZ Secs.*, 137 S. Ct. at 2049 (internal quotation marks omitted).

[140] *Id.*

[141] 514 A.2d 1086 (Del. 1986).

[142] The Builder's Statute is rather intricate but, in essence, provides that "[n]o action" for damages concerning "any alleged deficiency in the construction or manner of construction

earliest of several designated dates, irrespective of the date of the injury" and thus "prevents a claim from arising, whereas a statute of limitations bars an accrued cause of action."[143]

Another Delaware statute, 10 *Del. C.* § 8126, which repeatedly has been referred to as a statute of repose, also is instructive.[144] It provides as follows:

> No action, suit or proceeding in any court, whether in law or equity or otherwise, in which the legality of any ordinance, code, regulation or map, relating to zoning, or any amendment thereto, enacted by the governing body of a county or municipality, is challenged, whether by direct or collateral attack or otherwise, shall be brought after the expiration of 60 days from the date of publication in a newspaper of general circulation in the county or municipality in which such adoption occurred, of notice of the adoption of such ordinance, code, regulation, map or amendment.[145]

This language explicitly ties the expiration of the claim not to when any alleged claim accrued but rather to the date when notice of the ordinance to be challenged is published in a local newspaper. The statute thereby precludes legal challenges by those whose harm was discovered and accrued after the sixty days have passed, such

---

of any improvement to real property . . . shall be brought against" various persons "after the expiration of 6 years from whichever of the following [eight] dates shall be earliest." 10 *Del. C.* § 8127(b).

[143] *City of Dover*, 514 A.2d at 1089.

[144] *See, e.g.*, *Murray v. Town of Dewey Beach*, 67 A.3d 388, 391 (Del. 2013) (recognizing Section 8126 as "a statute of repose" and concluding that "the Court of Chancery lacked jurisdiction to hear those claims because, under § 8126, they were extinguished 60 days after the Town gave public notice of those actions"); *Farmers for Fairness v. Kent Cty. Levy Court*, 2013 WL 3333039, at *5 (Del. Ch. July 1, 2013) (stating that "Section 8126 is a statute of repose").

[145] 10 *Del. C.* § 8126(a).

44

as those later moving into a neighborhood who may otherwise seek to challenge the ordinance, and instead ties the repose period to the date of the newspaper publication.

Although the language of Sections 8126 and 8127 of Title 10 differs from Section 174 in certain respects, the common thread they share with Section 174 is that the time bar is tied to a specific designated event irrespective of when the claim accrues. As previously noted, this is a hallmark of a statute of repose.

Finally, Section 174 cannot be viewed as ambiguous on the theory that reading it to be a statute of repose would lead to an unreasonable or absurd result that the legislature could not have contemplated. To the contrary, although no commentary to the enactment of the six-year time period in Section 174 has been unearthed in this case, it would be entirely reasonable for the legislature to make the policy judgment that directors of Delaware corporations should be afforded certainty to be free from personal liability for authorizing a dividend six years after the payment of the dividend. This does not mean, of course, that the legislature could not have made a different policy judgment, but just that the judgment to provide certitude to directors is not an unreasonable one.

For the reasons explained above, the court concludes that the plain language of Section 174 supports the conclusion that the six-year time bar in that provision is a statute of repose. Even if the meaning of the time bar in Section 174 were

45

ambiguous, however, the legal history of Section 174 chronicled above confirms the conclusion that the six-year time limit was intended to operate as a statute of repose.

To repeat, the six-year period in Section 174 first appeared in Section 7 of the 1883 Act, which prohibited the payment of dividends "except from the surplus or net profits arising from the business of the corporation" and provided that the directors could be liable for any violation of that prohibition "at any time within the period of six years after paying any such dividends."[146] Although Section 7 was silent on the means of its enforcement, Section 41 of the 1883 Act provided a right to bring an action on the case against directors when they "shall be liable by the provisions of this act to pay the debts of such company."[147] In February 1899, the *Roebling's* court concluded that a claim for unlawful dividends under Section 7 could not be enforced in an action on the case under Section 41. Less than five weeks later, in March 1899, what was Section 7 of the 1883 Act was modified to state expressly that "in case of any violation of the provisions of this section, the directors under whose administration the same may happen shall be jointly and severally liable in an action on the case at any time within six years after paying such dividend . . . ."[148]

---

[146] 17 Del. Laws ch. 147, § 7 (1883).

[147] *Id.* § 41.

[148] 21 Del. Laws ch. 273, § 18 (1899).

Importantly, an action on the case at the time was governed by a three-year statute of limitations, to which tolling principles could be applied.[149] In my view, it would be illogical to infer that the legislature intended to incorporate a second, conflicting six-year statute of limitations into the same statute when clarifying the means to enforce an unlawful dividend claim. Rather, the only reasonable inference is that the legislature intended that the right of creditors to sue directors for unlawful dividends via an action on the case would continue to be governed by a three-year statute of limitations, which could be tolled, but subject to an outside limit of six years as a statute of repose.

As the United States Supreme Court commented in *ANZ Securities*, the "pairing of a shorter statute of limitations and a longer statute of repose is a common feature of statutory time limits."[150] The legal history of Section 174, particularly the rapid and unequivocal response to the *Roebling's* decision reflected in the adoption of the 1899 Act, supports that this was the legislative intent behind including a six-year time period in the unlawful dividend statute. No reason has been suggested, furthermore, why this intent would have changed when the statute was amended in

---

[149] *Del. C. 1852*, § 2742 (providing that "no action upon the case shall be brought after the expiration of three years from the accruing of the cause of such action" subject to certain exceptions). This statute remained unchanged through at least 1915. *See Del. C. 1915,* § 4671 (containing the same text as Section 2742 of the 1852 code and indicating that the provision came directly from the 1852 code).

[150] *ANZ Secs.*, 137 S. Ct. at 2045.

1937 to remove the reference to "an action on the case" and the source of the right to hold directors accountable for unlawful dividends became solely statutory in nature.

Finally, I am unpersuaded by J.P. Morgan's contention that the six-year period in Section 174 must have been intended to be a statute of limitations—and not a substantive qualification of a newly created right—on the theory that a common law right emanating from the trust fund doctrine was in existence to pursue unlawful dividend claims against corporate directors when the six-year period was added to the statute in 1883. Although a number of jurisdictions had recognized such a claim at common law,[151] no authority has been identified indicating that Delaware had adopted the trust fund doctrine or anything equivalent at common law for this purpose as of this time. Indeed, it was not until 1931 that "Delaware first acknowledged the trust fund doctrine in *Asmussen v. Quaker City Corp.*,"[152] where the court declined to adopt the doctrine.[153]

* * * * *

For the reasons explained above, the court holds that the six-year time limitation in Section 174 is a statute of repose. Accordingly, because J.P. Morgan

---

[151] *See supra.* n. 128.

[152] 156 A. 180 (Del. Ch. 1931).

[153] Brent Nicholson, *Recent Delaware Case Law Regarding Director's Duties to Bondholders*, 19 Del. J. Corp. L. 573, 580 (1994).

filed this action more than six years after any of the Challenged Dividends were paid, Count I fails to state a claim for relief under Sections 170, 172, 173, and 174 of the Delaware General Corporation Law.[154] As an alternative to seeking relief under these statutory provisions, J.P. Morgan alleges that the Challenged Dividends "were actual fraudulent transfers."[155] This issue is considered next in the court's analysis of Count II of the Complaint.

### D. J.P. Morgan's Fraudulent Transfer Claims Are Not Time-Barred

In Count II of the Complaint, J.P. Morgan seeks to recover approximately $13.7 million of allegedly fraudulent transfers that were made to insiders of DTC from 2011 to 2013 (as defined above, the "Challenged Transfers"). As just noted, J.P. Morgan also seeks to recover the Challenged Dividends as fraudulent transfers as an alternative to its unlawful dividend claim in Count I.

The parties agree that the timeliness of J.P. Morgan's fraudulent transfer claims is governed by Section 1309(1) of DUFTA. That provision requires that a fraudulent transfer claim be brought "within 4 years after the transfer was made or

---

[154] J.P. Morgan cites to *IAC/InterActiveCorp. v. O'Brien*, 26 A.3d 174, 177-78 (Del. 2011), for the proposition that "'the Chancellor will not be bound' by a limitations period 'if unusual conditions or extraordinary circumstances make it inequitable.'" Pl.'s Opp'n Br. 38. *IAC*, however, concerns laches and statutes of limitations. No authority has been identified to support extending this doctrine to statutes of repose. *See Lambeth*, 2018 WL 3239902, at *3 ("This Court and the United States Supreme Court have explained that statutes of repose are not subject to tolling doctrines sourced in equity.").

[155] Compl. ¶ 117.

the obligation was incurred or, if later, within 1 year after the transfer or obligation was or could reasonably have been discovered by the claimant."[156]   All of the transfers alleged to be fraudulent in this case, the last of which occurred in 2013, were made more than four years before J.P. Morgan filed this action in 2018.  Thus, for J.P. Morgan's fraudulent transfer claims to survive, they must have been brought within one year of when the unlawful transfers were or "could reasonably have been discovered."[157]

Neither side analyzes in any depth a key question at the center of their dispute over the timeliness of J.P. Morgan's fraudulent transfer claims:  whether the one-year time period under DUFTA starts when the mere existence of the transfers was or could reasonably have been discovered, or whether it starts when the fraudulent nature of the transfer was or could reasonably have been discovered.  Citing *In re Primedia, Inc. Shareholders Litigation*,[158] a case applying equitable tolling to a breach of fiduciary duty claim, J.P. Morgan argues that "mere knowledge of the transfers, without more, does not mean [J.P. Morgan] had the 'facts necessary to plead the [fraud] claim and survive the motion to dismiss.'"[159]  Defendants argue in a footnote that *Primedia* is inapplicable because it does not address the tolling

---

[156] 6 *Del. C.* § 1309(1).

[157] *Id.*

[158] 2013 WL 6797114 (Del. Ch. Dec. 20, 2004).

[159] Pl.'s Opp'n Br. 47 (quoting *Primedia*, 2013 WL 6797114, at *12).

provision in Section 1309(1) and, implicitly, seem to argue that knowledge of the transfer itself is all that is needed.[160] There does not seem to be any clear Delaware authority on this issue, but what authority there is supports J.P. Morgan's position.

In *In re Transamerica Airlines, Inc.*,[161] this court found that allowing an amendment to a fraudulent transfer claim would be futile, as the claim was time-barred under Section 1309(1) of DUFTA.[162] The court relied on the fact that the allegations in the complaint were based largely on a public 10K from 1987 and a public article from 1987, so "Akande could have reviewed the TransAir 10K in 1987 or at any time from then through 2003 and learned the same information that caused him to file this lawsuit in 2005."[163] The court's analysis implies that the central question under Section 1309(1) is, as J.P. Morgan argues, when the plaintiff discovered or reasonably could have discovered the facts that caused it to file the lawsuit, *i.e.*, not just that a transfer had occurred but that the transfer was fraudulent in nature.

This approach is supported by a Delaware bankruptcy court decision that declined to bar an action for fraudulent transfer under DUFTA.[164] The court

[160] Defs.' Reply Br. 35 n.105.

[161] 2006 WL 587846 (Del. Ch. Feb. 28, 2006).

[162] *Id.* at *5.

[163] *Id.*

[164] *Forman v. Kelly Capital, LLC*, 2015 WL 3827003, at *7-8 (Bankr. D. Del. June 19, 2015).

51

described Section 1309(1) as allowing that "[i]f the fraud is hidden, . . . the statute of limitations is extended to one year *after the fraud* was or could reasonably have been discovered by the creditor."[165] The court explained that the "Complaint contains facts that are suggestive of the difficulty of reasonable discovery by a creditor of any fraud committed" in part "[b]ecause the Debtor was not a public company" and therefore "its board resolutions and financial records were not available to creditors."[166] "Thus, from the face of the Complaint the Court [could not] conclude that the equitable tolling provision [in Section 1309(1)] does not apply."[167]

Looking at jurisdictions outside of Delaware, a treatise on the Uniform Fraudulent Transfer Action ("UFTA") reports that "[i]t is generally held that the one-year discovery period commences when the *fraudulent nature* of the transfer is discovered, rather than when the transfer itself is discovered," and that authority to

---

[165] *Id.* at \*8 (emphasis added).

[166] *Id.*

[167] *Id.*

the contrary that "focuses on the literal language" of the statute is "sparse."[168] The

Sixth Circuit's decision in *In re Fair Finance Co.*[169] is instructive.

There, the court construed under Ohio law a provision identical to Section

1309(1) of DUFTA to mean that the one-year period "begins to run at the point when

a plaintiff discovers or, in the exercise of reasonable care, could have discovered the

transfer and its fraudulent nature."[170] In reaching this conclusion, the court

considered that (i) other jurisdictions had so concluded,[171] (ii) this rule aligned "with

Ohio's broader statute of limitations and discovery rule jurisprudence," and (iii) the

broader purpose of UFTA is "to discourage fraud and provide aggrieved creditors

---

[168] Peter Spero, *Fraudulent Transfers, Prebankruptcy Planning and Exemptions* § 4.24 (Aug. 2018 update); *see also Santander Bank, N.A. v. Branch Banking & Tr. Co.*, 2018 WL 8368857, at *2-3 (M.D. Pa. Feb. 5, 2018) (explaining that the "majority approach" is that "the one-year period begins when [one] becomes aware of the fraudulent nature of the transfer").

[169] 834 F.3d 651, 673-74 (6th Cir. 2016).

[170] *Id.* at 670, 674.

[171] *See, e.g., Workforce Sols. v. Urban Servs. of Am., Inc.*, 977 N.E.2d 267, 278-79 (Ill. App. Ct. 2012) (relying on Illinois discovery rule principles to interpret the UFTA one-year period as beginning to run when "the injured plaintiff knows or reasonably should have known that he has been injured and that his injury was wrongfully caused"); *Moore v. Browning*, 50 P.3d 852, 859 (Ariz. Ct. App. 2002) (stating that the claim was time-barred unless the plaintiffs could show that "they did not discover and could not have discovered the fraudulent nature of the . . . transfers"); *Duran v. Henderson*, 71 S.W.3d 833, 839 (Tex. Ct. App. 2002) ("A creditor's cause of action to set aside a fraudulent conveyance accrues when the creditor acquires knowledge of the fraud, or would have acquired such knowledge in the exercise of ordinary care."). *But see Nat'l Auto Serv. Ctrs., Inc. v. F/R 550, LLC*, 2016 WL 1238265, at *5 (Fla. Dist. Ct. App. Mar. 30, 2016) (relying on the plain language to conclude that the one-year period runs from when the *transfer* was or could reasonably have been discovered).

with a means to recover assets wrongfully placed beyond their reach."[172]  Regarding

the third consideration, the court reasoned that requiring "a claimant to bring suit

within one year of discovering a transfer, without having discovered facts that would

put the claimant on notice as to the transfer's fraudulent nature, would be to interpret

[the statute] in a manner that is directly at odds with the animating purpose of the

UFTA."[173]

Schmidt v. HSC, Inc.[174] also is instructive.  There, the Supreme Court of

Hawaii concluded "that the one year limitations period that begins on the date a

transfer 'was or could reasonably have been discovered by the claimant' commences

when a plaintiff discovers or could reasonably have discovered a transfer's

fraudulent nature."[175]  In addition to taking into account the purpose of the statute,

the court found that the word "transfer" in the limitations provision "clearly refers

to the 'fraudulent transfer' identified in the preceding sentence" of the provision and

that "it would be legally absurd and unjust to interpret the discovery rule to preclude

claims under the UFTA if plaintiffs were never aware they held a potential claim."[176]

---

[172] *Fair Finance*, 834 F.3d at 672, 674.

[173] *Id.* at 674; *see also Freitag v. McGhie*, 947 P.2d 1186, 1189 (Wash. 1997) (en banc) ("Common sense and the statutory purpose of the UFTA necessitate a finding that the statute begins to run with the discovery of the fraudulent nature of the conveyance.").

[174] 319 P.3d 416 (Haw. 2014).

[175] *Id.* at 417.

[176] *Id.* at 426-27.

Based on the reasoning and the substantial weight of authority discussed above, the court will apply the one-year period in Section 1309(1) of DUFTA as starting when J.P. Morgan discovered or reasonably could have discovered the fraudulent nature of the transfers for which it seeks relief, *i.e.*, the Challenged Transfers and Challenged Dividends. Defendants make essentially three arguments why J.P. Morgan should be time-barred from asserting these claims as a factual matter. They are addressed chronologically.

### 1. The Viewpointe Litigation

Defendants first argue that J.P. Morgan should have discovered the unlawful nature of the Challenged Dividends as early as 2008 when DTC produced documents to J.P. Morgan's counsel (Skadden, Arps, Slate, Meagher & Flom LLP) during discovery in a patent litigation involving a related entity (Viewpointe) reflecting that DTC had entered into other license agreements in violation of the License Agreement between DTC and J.P. Morgan.[177] This argument fails for two reasons.

First, the argument fails for the same reason it was flatly rejected in the Texas Action, albeit in the context of deciding whether notice of more favorable licenses had been provided under the MFL Provision in the JPM License Agreement. Noting that discovery in this "wholly different litigation" involving Viewpointe was governed by a protective order, the district court held: "To claim that Skadden

---

[177] Defs.' Reply Br. 9-12.

should have violated that protective order is untenable. DTC's argument is without merit."[178] The same holds true here.

Second, even if J.P. Morgan was on notice that DTC had entered into more favorable licenses as of 2008 as a result of the litigation involving Viewpointe, no showing has been made that J.P. Morgan was aware at that time that DTC was issuing dividends, much less that J.P. Morgan was aware at that time of facts suggesting that the dividends DTC paid were fraudulent in nature.

### 2.      Pre-Judgment Discovery in the Texas Action

Defendants next argue that J.P. Morgan "was on notice at least as of January, 2014 of information sufficient" to assert its fraudulent transfer claims based on discovery it obtained in the Texas Action before the Judgment was obtained in June 2015.[179] In particular, defendants rely on excerpts from two depositions taken in January 2014 of Keith DeLucia, DTC's CEO and President, and Shephard Lane, DTC's Secretary and General Counsel. Having reviewed all the testimony cited in defendants' briefs on this point, the court concludes that the argument is meritless.

With respect to the Challenged Dividends, the cited testimony made J.P. Morgan aware at most that DTC had issued some dividends in the 2008 to 2011 time

---

[178] *JP Morgan Chase Bank*, 79 F. Supp. 3d at 651 (indicating that "even if the Skadden attorney received information regarding some of the Subsequent Licenses, it was during discovery in a wholly different litigation").

[179] Defs.' Opening Br. 22-25.

frame.[180]  The cited testimony, however, did not make J.P. Morgan aware of the scope of DTC's dividend payments or of DTC's financial condition at the time so as to put J.P. Morgan on notice that the dividends may have been fraudulent in nature. In fact, DTC employed obstructionist tactics to preclude its witnesses from answering questions intended to elicit such information, including questions about DTC's assets, financial health, cash position, the per-share value of any dividend, the date of each dividend, and their total amounts.[181]  The following excerpt from the deposition of DTC's General Counsel, Shephard Lane, which was followed by a lengthy series of instructions not to answer, is emblematic:

> Q. How many shares of Data Treasury are—are currently owned? What's the total value of that dividend?
> MR. GILLILAND:  Objection, form.
> A.  I don't know about my lawyer, but I consider these questions totally irrelevant to the issues of this case and a most favored nations, most favored licensee position of Chase, and there is no relevancy to your questions, nor will it lead to relevant testimony.

---

[180] *See* Gilliland Aff. Ex. A, at 48-50 (DeLucia testifying that he had received four or five dividends from DTC between 2008 and 2011, which according to his estimates totaled between $14-22 million); Gilliland Aff. Ex. B, at 59-60 (Lane testifying that the last dividend was issued on 12/31/2011 and that it was "probably closer to sub 50 cents a share" than to a dollar per share).

[181] *See* Gilliland Aff. Ex. A, at 47-48 (DeLucia refusing to specify the total amount of dividends DTC had issued), 57:18-25 (DeLucia refusing to testify as to the amount of cash DTC currently had); *id*. Ex. B, at 60-61 (Lane refusing to answer a question about the total value of a 2011 dividend), 62-64 (Lane refusing to answer questions about DTC's financial situation and if it could pay J.P. Morgan $70 million); *see also* Freund Aff. Ex. A, at 203-04 (Ballard refusing to testify as to the amount of dividends DTC gave its shareholders between 2000 and 2010 and being instructed not to answer questions about "the financial condition, the financial dealings of Data Treasury").

MR. GILLILAND: And I'm going to—I'm going to support the witness' statement in that I think the questions are harassing to the extent they go beyond any dividends he may have received directly, because as a witness, I think there may be some marginal relevance to that, but for the corporation in general, I see no relevance whatsoever to the case at hand.

So I believe the questions are harassing and instruct him not to answer to the broader scope of the financial operations of the company.

Q. (By Mr. Mayerfeld) Are you accepting your attorney's instruction?

A. Yes.[182]

With respect to the Challenged Transfers, defendants do not cite any deposition testimony that put J.P. Morgan on notice of the specifics of these transfers, let alone that they may have been fraudulent. Rather, apart from the issue of dividends, the cited testimony simply refers to compensation-related payments.[183]

### 3. Post-Judgment Discovery in the Texas Action

Defendants' third argument is based on documents DTC produced to J.P. Morgan "by October 1, 2015" as part of post-Judgment discovery in the Texas Action.[184] As an initial matter, defendants' opening brief made no effort to identify which documents it was referring to or to explain in any specific sense why the documents should have placed J.P. Morgan on notice that any of the Challenged

---

[182] Gilliland Aff. Ex. B, at 60-61.

[183] *See, e.g.*, Gilliland Aff. Ex. A, at 47 (DeLucia testifying that "paycheck, bonus, equity, that's what I've received. There—there's nothing else that I believe that I've received other than—the dividends would be, I guess, the only other thing that I received").

[184] Defs.' Opening Br. 23.

Dividends or Challenged Transfers were fraudulent in nature.[185]   This failure

constitutes a waiver.[186]

Putting the issue of waiver aside, defendants' reply brief identified several

exhibits attached to the Complaint that they contend "show the Company did not

have assets to pay a $69 million judgment" to J.P. Morgan.[187]   The cited documents

consist of (i) summary DTC financial information for 2011-2013, (ii) budgets for

2012 and 2013, and (iii) a set of minutes from a June 13, 2012 board meeting.[188]   The

information in these documents post-dates 2010 and provides no insight concerning

---

[185] Defendants' opening brief only cites four pages of a privilege log that provides no substantive information about the contents of any documents.  *See* Defs.' Opening Br. 23 (citing Gilliland Aff. Ex. D).

[186] *See Zutrau v. Jansing*, 2013 WL 1092817, at *6 (Del. Ch. Mar. 18, 2013) (noting that "[u]nder the briefing rules, a party is obliged in its motion and opening brief to set forth all of the grounds, authorities and arguments supporting its motion" and that "courts routinely have refused to consider arguments made in reply briefs that go beyond responding to arguments raised in a preceding answering brief").  Further, at argument defendants' counsel discussed general ledgers that were produced to J.P. Morgan in August of 2015 as providing notice of these transfers, but admitted that the "notice of that specific amount of that specific transfer is not attached to the complaint or cited in our brief, because it would be from a general ledger we did not attach."  Tr. 31-32.  While the general ledgers were produced after argument, Dkt. 40, defendants waived any arguments based on these ledgers by failing to raise the issue until argument.  *See, e.g.*, *Zutrau*, 2013 WL 1092817, at *6.

[187] Defs.' Reply Br. 33 (citing Compl. Exs. L-R).  In their reply brief, defendants also cite ten documents attached as exhibits H-P of the complaint that J.P. Morgan filed in C.A. No. 2017-0923.  *Id.* at 33 n.97.  Eight of these documents are the same as ones attached to the Complaint in this action.  *See* Compl. Exs. J-N, P-R.  The other two documents are minutes (with redactions) of DTC board meetings held on December 28, 2011 and December 20, 2012.  Defendants' reply brief makes no effort to explain what parts of those minutes they believe are relevant to their time bar arguments, and the court declines to engage in a scavenger hunt to attempt to do so.

[188] *See* Defs.' Reply Br. 33 (citing Compl. Exs. L-R).

the amounts of, or the circumstances under which, the Challenged Dividends were paid during the 2006-2010 time period such that J.P. Morgan could be said to have been placed on notice that any of these dividends were fraudulent in nature.

Insofar as the Challenged Transfers are concerned, only one of the cited documents—the June 2012 board minutes—specifically identifies any of these transfers. Those minutes raise questions about the basis for two of the Challenged Transfers, namely a $300,000 payment to Celestial Partners and a $110,208.84 payment to Potens.[189] More specifically, the minutes reflect that Ballard "could not recall the genesis of the payment" to Potens but that he would look into the matter, and that Ballard believed the payment to Celestial Partners "was in fact a loan to him," which the board then ratified.[190] Although this is a closer call than any of defendants' other arguments concerning the Challenged Payments, the questions raised in the minutes about these two payments were not sufficient in the court's view to put J.P. Morgan on notice that they were fraudulent in nature without making further inquiry given the explanations that Ballard provided.

Significantly, it is alleged that J.P. Morgan's ability to make further inquiries in the Texas Action about the Challenged Payments was shut down. The Complaint

---

[189] Compl. Ex. O. The June 2012 board minutes also refer to two other transfers (a $500,000 payment to Lane and a $396,000 payment to Celestial Partners), but those are characterized as payments for compensation. *Id.*

[190] *Id.*

specifically alleges that after DTC made its initial post-Judgment production of documents, it "continuously failed to disclose any document or other materials explaining or demonstrating that DTC received legitimate consideration in exchange for these post-June 2011 transfers."[191] The Complaint further alleges that DTC has refused to produce witnesses for depositions on multiple occasions and that DTC permitted its corporate documents to be destroyed while J.P. Morgan's post-Judgment discovery demands in the Texas Action were outstanding.[192] J.P. Morgan only learned about the latter incident on April 13, 2017. The Complaint was timely filed under Section 1309(1) of DUFTA within one year of this revelation.

Turning back to the Challenged Dividends, it was not until February 13, 2018, the last day permissible in the Texas Action, that DTC disclosed for the first time (i) that it had paid approximately $117 million in dividends before 2011 and (ii) its total revenue since formation.[193] J.P. Morgan filed its Complaint less than two months later, well within the one-year discovery period under Section 1309(1).

\* \* \* \* \*

---

[191] *Id.* ¶ 44.

[192] *Id.* ¶¶ 45-47.

[193] *Id.* ¶ 61.

For the reasons explained above, the court concludes that all of defendants' arguments concerning the timeliness of J.P. Morgan's fraudulent transfer claims lack merit.

### E.    J.P. Morgan Has Pled Facts Sufficient to State a Claim Under DUFTA with Respect to the Challenged Transfers and Dividends

Defendants have moved to dismiss J.P. Morgan's fraudulent transfer claims for failure to meet the particularity requirements of Delaware Court of Chancery Rule 9(b).  Defendants also argue that J.P. Morgan failed to adequately plead the "actual intent" necessary to state a fraudulent transfer claim under the less onerous pleading standard of Rule 12(b)(6).

Section 1304(a) of DUFTA defines a fraudulent transfer, in relevant part, as follows:

> (a)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> (1)   With actual intent to hinder, delay or defraud any creditor of the debtor.[194]

Section 1304(b) enumerates the following factors that may be considered in determining "actual intent" for purposes of Section 1304(a)(1):

> (b) In determining actual intent under paragraph (a)(1) of this section, consideration may be given, among other factors, to whether:
> (1) The transfer or obligation was to an insider;

---

[194] 6 *Del. C.* § 1304(a).

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all of the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[195]

Under Court of Chancery Rule 9(b), "the circumstances constituting fraud or mistake shall be stated with particularity."[196]  "Intent, however, may be averred generally."[197]  Therefore, "[i]n order to state a fraudulent transfer claim, [J.P. Morgan] must generally plead facts showing intent to defraud with specific supporting facts describing the circumstances of the transfer."[198]  J.P. Morgan has met this pleading standard with respect to both the Challenged Transfers and the Challenged Dividends.

---

[195] *Id.* § 1304(b).

[196] Del. Ch. Ct. R. 9(b).

[197] *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 198 (Del. Ch. 2014) (citing Del. Ch. Ct. R. 9(b)) (internal quotation marks omitted).

[198] *Id.*

With respect to the Challenged Transfers, the Complaint alleges with particularity the circumstances of the allegedly unlawful transfers, *i.e.*, the names of the insiders to whom DTC transferred money, the amount of money transferred, and the year in which the transfers occurred.[199] With respect to the Challenged Dividends, the Complaint alleges that DTC improperly declared and paid more than $134 million in unlawful shareholder dividends, of which $117,148,242.07 were paid from 2006 through May 2011.[200] Given that the defendants obstructed J.P. Morgan from obtaining discovery concerning the details of the dividends paid during the period—information that is within their control—the particularity requirement of Rule 9(b) has been satisfied with respect to the Challenged Dividends.[201]

The Complaint also alleges numerous facts supporting many of the factors listed in Section 1304(b), from which "actual intent" can be inferred. These factual allegations serve as "badges of fraud" from which it is reasonably conceivable that

---

[199] Compl. ¶¶ 74, 84, 93, 125-33.

[200] *Id.* ¶ 52.

[201] *See* Alan Wright et al., 5A *Federal Practice & Procedure* § 1298 (Apr. 2019 update) (explaining that under Fed. R. Civ. P. 9(b), which is identical to Del. Ch. Ct. R. 9(b), "courts may relax Rule 9(b)'s fraud pleading requirement if the defendant is alleged to have concealed the facts that would permit the plaintiff to plead fraud with particularity"); *see also Gregg v. Rowles*, 1992 WL 364759, at *2 (Del. Ch. Dec. 2, 1992) (Allen, C.) (providing that "[t]he test of whether an attempted pleading of fraud states sufficient 'circumstances' to satisfy Rule 9 is not scientific" and that "[g]enerally, it may be said that an allegation of fraud is legally sufficient under Rule 9(b) if it informs defendants of the precise transactions at issue, and the fraud alleged to have occurred in those transactions, so as to place defendants on notice of the precise misconduct with which they are charged") (internal quotation marks and alterations omitted).

DTC had a fraudulent intent as to both the Challenged Dividends and the Challenged

Transfers. They include the following:

- The challenged payments largely were made to insiders.[202]

- Given the self-executing terms of the JPM License Agreement, it is reasonably conceivable that DTC and its directors knew that DTC would be liable to J.P. Morgan for a significant sum when the dividends and transfers were being made.[203]

- DTC had a deficit of nearly $50 million at the end of 2011 and its net income in 2011, 2012, and 2013 was significantly less than the refund (approaching $70 million) owed to J.P. Morgan.[204]

- DTC concealed from J.P. Morgan many other license agreements with more favorable terms in violation of the JPM License Agreement.[205]

---

[202] Compl. ¶¶ 7-17, 74, 84, 93, 125-33 (listing the identity of the recipients of the Challenged Transfers between 2011 and 2013 and their relationship to DTC as insiders); *id.* ¶¶ 39, 66 (indicating that DTC's board members and officers owned or controlled nearly half of DTC's equity and therefore benefitted disproportionately from the dividends issued between 2006 and 2010).

[203] As discussed above, the district court in the Texas Action held that the plain language of the MFL Provision in the JPM License Agreement "makes its operation automatic." *JP Morgan Chase Bank*, 79 F. Supp. 3d at 650. This holding was not challenged on appeal to the Fifth Circuit. *JP Morgan Chase Bank*, 823 F.3d at 1010.

[204] Compl. ¶¶ 76-78, 89-90, 92; *see* 6 *Del. C.* § 1304(b)(9) ("The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.").

[205] Compl. ¶ 60; *see Winner Acceptance Corp. v. Return on Capital Corp.*, 2008 WL 5352063, at *12 (Del. Ch. Dec. 23, 2008) (concluding that a fraudulent transfer was adequately pled where "Plaintiffs allege Defendants diverted . . . funds . . . to Defendants' own uses, . . . Defendants made the challenged transfers to insiders with the intent to defraud Plaintiffs and at a time when there were inadequate assets . . . [and] Defendants concealed the transfers and effectively caused the debtors . . . to abscond"); 6 *Del. C.* § 1304(b)(7) ("The debtor removed or concealed assets.").

- DTC engaged in obstructionist conduct during discovery, including refusing to permit witnesses to answer questions during pre-Judgment discovery, refusing to produce witnesses for questioning during post-Judgment discovery, and permitting the destruction of DTC's documents during the pendency of the Texas Action.[206]

With regard to the Challenged Transfers, the Complaint alleges additional specific facts that provide further support that these transfers were fraudulent. These facts include that DTC continued to make transfers even after J.P. Morgan (i) sent DTC a letter in June 2011 indicating it had learned about other license agreements and reminding DTC of its refund obligation under the MFL Provision and (ii) filed the Texas Action in November 2012, which was pending throughout the period the rest of the Challenged Transfers were made.[207] All in all, J.P. Morgan pleads numerous facts substantiating multiple "badges of fraud" from which it is reasonably conceivable that J.P. Morgan can establish that the defendants had an actual intent to defraud with respect to both the Challenged Dividends and the Challenged Transfers.

\* \* \* \* \*

For the reasons explained above, defendants' motion to dismiss J.P. Morgan's fraudulent transfer claims under Court of Chancery Rules 9(b) and 12(b)(6) with

---

[206] Compl. ¶¶ 44-47; *see* 6 *Del. C.* § 1304(b)(7) ("The debtor removed or concealed assets.").

[207] Compl. ¶¶ 34, 36, 75-76, 85, 94; *see* 6 *Del. C.* § 1304(b)(4) ("Before the transfer was made . . . the debtor had been sued or threatened with suit.").

respect to the Challenged Dividends (pled in the alternative in Count I) and the Challenged Transfers (Count II) will be denied.[208]

In paragraph 137 of the Complaint, J.P. Morgan pleads in the alternative that its fraudulent transfer claim with respect to the Challenged Transfers be considered as an unlawful dividend claim.[209] There is no claim for a constructive dividend in Delaware,[210] and no facts are pled from which it is reasonably conceivable that these payments—which were made to specific individuals—constitute dividends that would have been distributed to all stockholders. Accordingly, this aspect of Count II will be dismissed.[211]

---

[208] Defendants argue that "Count III is dependent upon Plaintiff establishing claims for relief under Counts I and II and, therefore, it should be dismissed for the same reasons." Defs.' Opening Br. 25 n.16. Because the court is not dismissing Count II and parts of Count I, it will not dismiss Count III either.

[209] Compl. ¶ 137.

[210] *See Quadrant Structured*, 102 A.3d at 201("Delaware law does not recognize a claim for constructive dividends.").

[211] Defendant Knutsen argues that Counts II and III should be dismissed as to him to the extent those claims relate to Challenged Transfers that were made in 2013 because he was not on the DTC board at that time and thus could not have acted with a culpable state of mind. *See Goldman, Sachs & Co.*, 937 A.2d at 794 ("Likewise, to the extent the Uniform Fraudulent Transfer Act might be used to hold stockholders liable for dividends or distributions from a corporation, liability would be predicated on the recipients' own state of mind."). The Complaint does not allege any facts suggesting that Knutsen was a DTC insider after his resignation from the board on or about December 28, 2012. *See* Compl. ¶ 10. Accordingly, Counts II and III will be dismissed as to Knutsen for Challenged Transfers that were made in 2013.

## F. Count IV States a Claim for Relief

In Count IV of the Complaint, J.P. Morgan contends it is entitled as a judgment creditor of DTC to recover from VEEDIMS repayment of a loan exceeding $1.5 million that DTC extended to VEEDIMS in or about November 2012, which is currently due and owing.[212]  In a one-sentence argument, unsupported by any authority, defendants contend that this claim should be dismissed because J.P. Morgan "suffers disabling conflicts in that it is both:  (a) suing DTC as a direct defendant in this case, and (b) seeking to act on behalf of DTC in pursuing this claim against VEEDIMS."[213]  The court disagrees.  The scenario described here does not create a disabling conflict.  J.P. Morgan is not alleged to owe any duty to DTC and is not seeking to act on its behalf in any real sense.  Rather, J.P. Morgan simply is seeking to enforce and collect on its Judgment against DTC by obtaining repayment of an outstanding liability that is due and owing to DTC.  In other words, J.P. Morgan is acting in DTC's name only as a judgment creditor for J.P. Morgan's own benefit.

---

[212] Compl. ¶¶ 143-44, 147.  J.P. Morgan contends in the alternative that the loan to VEEDIMS, an entity that was controlled by Ballard at the time, was a fraudulent transfer. *Id.* ¶ 148.  Defendants make no substantive argument specific to this theory.  They rely instead on the same arguments advanced in seeking dismissal of the fraudulent transfer claim for the Challenged Transfers.  Defs.' Opening Br. 43 ("For the reasons argued above, the fraudulent transfer claim is time-barred because the loan is over four years old and is plead without particularity.").  Accordingly, insofar as this alternative theory is concerned, the motion to dismiss fails for the same reasons the motion to dismiss Count II was denied with respect to the Challenged Transfers.

[213] Defs.' Opening Br. 43.

### G. The Claims Against Celestial Will Not Be Dismissed

J.P. Morgan contends that Celestial Partners "is and was at all relevant times the alter ego of Ballard" and that "Ballard is liable for the debts and obligations of Celestial Partners, and vice versa."[214] Defendants argue that the claims against Celestial Partners should be dismissed because (i) it will be "difficult, if not impossible," for J.P. Morgan to prove that Celestial Partners was Ballard's alter ego given that Ballard died in April 2018, and (ii) J.P. Morgan has taken no steps to revive Celestial Partners' charter, which was forfeited in May 2015 for failure to maintain a registered agent in Delaware.[215]

As to the first point, defendants have not directly challenged the overall sufficiency of the Complaint's allegations that Celestial Partners was Ballard's alter ego.[216] Accordingly, although Ballard's unavailability may impair J.P. Morgan's ability to establish a basis for veil piercing in certain respects, that is not grounds for the court to preclude J.P. Morgan at the pleadings stage from the opportunity to prove its case using evidence that is available after the completion of discovery.

---

[214] Compl. ¶¶ 108-09.

[215] Defs.' Opening Br. 44-45. The court takes judicial notice that Celestial Partners "is no longer in existence and good standing under the laws of the State of Delaware having become forfeited [on May 13, 2015] for failure to obtain and designate a registered agent." *JPMorgan Chase Bank, N.A. v. Ballard*, C.A. No. 2017-0923-AGB, Celestial Partner's Mot. to Dismiss Ex. A (Dkt. 29) (certificate of Delaware Secretary of State).

[216] *See* Compl. ¶¶ 96-109 (alleging, among other things, that Ballard was the sole officer and employee of Celestial Partners, failed to observe corporate formalities, used monies paid to Celestial Partners as his own, and comingled resources).

As to the second point, there is no equity to defendants' position that Ballard's estate should be able to evade potential liability in this case due to Ballard's failure to comply with a basic requirement of Delaware law with respect to Celestial Partners, which was established as a Delaware limited liability company. The parties' briefs, however, do not address potential avenues that may exist to revive the certificate of formation of Celestial Partners under the Delaware Limited Liability Company Act so that relief can be sought against it by, for example, the appointment of a receiver. Accordingly, the parties are directed to confer and to report back to the court jointly within ninety days with their respective views on this issue and a proposed course of action.

## IV.   CONCLUSION

For the reasons explained above, defendants' motion to dismiss is granted in part and denied in part. The parties are directed to confer and to submit an implementing order consistent with this opinion within five business days.

**IT IS SO ORDERED.**